## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| MARK J. JOHNSON | |
| Plaintiff, | |
| v. | CASE NO. |
| UNION PACIFIC RAILROAD COMPANY, | |
| Defendant. | |

### COMPLAINT AND DEMAND FOR JURY TRIAL

#### PARTIES

1.     Plaintiff Mark J. Johnson ("Johnson") is an African American male. He is a resident of Longview, Texas and, at all relevant times unless otherwise indicated, was a full-time employee of Defendant Union Pacific Railroad Company ("UPRR") within the meaning of 42 U.S.C. § 2000e.

2.     UPRR is incorporated in Delaware and maintains its corporate headquarters in Omaha, Nebraska. UPRR is authorized to and does conduct substantial business in Texas and is an "employer" within the meaning of 42 U.S.C. § 2000e.

#### VENUE

3.     Venue is proper in this district as Johnson regularly worked here and a substantial part of the events or omissions giving rise to his claims occurred here.

#### JURISDICTION

4.     This Court has jurisdiction pursuant to 42 U.S.C. § 2000e *et seq*., 42 U.S.C. § 1981, and 28 U.S.C. § 1331.

5.      Johnson filed complaints with the Equal Employment Opportunity Commission ("EEOC") on July 11, 2014 and November 4, 2016 alleging discrimination and retaliation based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The EEOC issued to Johnson a Notice of Right to Sue on November 4, 2016.

## GENERAL ALLEGATIONS

6.      Johnson began working for UPRR in October 2010 as a conductor-trainee.

7.      In May 2012, Johnson was accepted into UPRR locomotive engineer training and came under the supervision of UPRR Manager of Operating Practices Danny Cruchelow ("Cruchelow").

8.      Cruchelow is, upon information and belief, a white male.

9.      Upon Johnson's acceptance into the engineer training program Cruchelow almost immediately began harassing Johnson and targeting him for increased scrutiny and surveillance and began diminishing Johnson's credibility with his trainers and co-workers.

10.     On or about September 24, 2012, Cruchelow cursed at and berated Johnson over the phone regarding Johnson's job status listing, which is a service provided to UPRR by a third-party company and over which Johnson had no control. Cruchelow would not listen to Johnson's attempts to explain to situation.

11.     Johnson called Cruchelow approximately two hours later to attempt to smooth things over, expressing that they seemed to have gotten off on the wrong foot. Cruchelow only escalated his demeaning verbal assault, telling Johnson not to expect an apology, that he "didn't give a damn" how Johnson felt about the earlier conversation, and then threatened to write up Johnson for insubordination.

12.     Shortly thereafter, Cruchelow began controlling the employees that Johnson

trained with and systematically informed those employee trainers, without basis, that Johnson had attitude problems and had could not effectively operate trains. This greatly diminished Johnson's professional reputation at a critical point in his career and prejudiced his co-workers against him.

13.     Having been informed of Cruchelow's derogatory and unfounded statements against him, Johnson began experiencing significant and ongoing anxiety, stress and worry.

14.     Despite the ongoing stress and anxiety, Johnson managed to complete engineer training and returned to work as a conductor with occasional shifts as an engineer but Cruchelow continued his psychological assault.

15.     In or about September 2013, Cruchelow called an engineer who had been working with Johnson and made unfounded negative comments about Johnson's job performance as a conductor on a recent trip, and further informed the engineer that Cruchelow was "watching" Johnson.

16.     Informed of the call from Cruchelow to the engineer, Johnson's fears, stress, anxiety, humiliation and worry increased knowing that he was being singled out for surveillance by Cruchelow.

17.     Johnson lived in constant fear for his job knowing that Cruchelow could, at any moment, make accusations against him that could lead to disciplinary action and/or cause him to lose his job.

18.     Further, Johnson's co-workers began expressing that they no longer wished to work with him knowing that he was the target of management and not wanting to get caught up in any problems themselves.

19.     In or about May 2014, Johnson, relying on his training and putting safety first,

undertook efforts to slow a train which he believed to be speeding toward a signal. This type of action should be lauded by the company and is something that had been done by other employees without issue. In this instance however, Cruchelow pulled Johnson out of service and placed him in remedial training.

20.     This action by Cruchelow further humiliated Johnson and had a significant impact on his ability to perform his duties. It further undermined his credibility with his co-workers and increased his stress, fear, anxiety and depression.

21.     On May 5, 2014, Johnson filed a complaint with UPRR's internal Equal Employment Opportunity office, describing these events and specifically stating that he felt he was targeted by Cruchelow and that Cruchelow was hostile toward black employees.

22.     In the meantime, the stress, anxiety, depression and humiliation became too much for Johnson to continue working and he requested a medical leave of absence in order to seek treatment.

23.     Jonson's medical leave of absence last from June 2014 to September 2015, during which time he was treated by mental health professionals for the mental and emotional distress caused by his treatment by Cruchelow.

24.     Johnson was not paid during the leave of absence.

25.     UPRR took no action on Johnson's complaint. Despite repeatedly following up on the status of his complaint, Johnson was not informed until October 2016 that his case had been closed by UPRR in December 2014, without any action taken.

26.     When Johnson returned to work following his leave of absence, UPRR recklessly placed him right back under the supervision of Cruchelow and subjected him to further stress, anxiety, humiliation and intimidation.

27.     In March 2016, Cruchelow suspended Johnson for 30 days without pay for a minor incident. Upon completing the suspension, Cruchelow imposed a new requirement on Johnson, that he complete a rules training class. However, the rules training class would not be held for another 18 days, causing Johnson to miss more than two additional weeks of pay. A similarly situated white employee was cited for the same rule violation two weeks *after* Johnson and was allowed to return to work before Johnson.

28.     Cruchelow also required Johnson to complete 20 training trips, with Cruchelow directly supervising. Johnson often observed Cruchelow sleeping during these trips.

29.     Johnson earned a passing score of 86 on his training rides yet was still not permitted to mark up as an "Engineer I." When Johnson inquired about this issue through his union, Cruchelow communicated that Johnson had failed the test and only agreed to return Johnson to regular duty when confronted with the actual test results.

30.     In August 2016, Cruchelow sent Johnson, and only Johnson, for extra training on a simulator for no performance-related reason.

31.     In September 2016, Cruchelow issued disciplinary charges to Johnson and told him to sign a "waiver," thereby accepting the discipline without the benefit of an on-property discipline hearing as mandated by the Collective Bargaining Agreement.

32.     Johnson refused to accept the discipline and chose to proceed with the investigation to take place on October 12, 2016. However, when he and his union representatives showed up for the proceedings, there was no one to be found. When Johnson's union contacted Cruchelow, he informed them that if Johnson did not call him, Cruchelow would charge Johnson with insubordination. Johnson called and Cruchelow did not answer.

33.     It was clear that Cruchelow, knowing he had no real basis to discipline Johnson,

simply wanted to continue his intimidation, harassment and humiliation of Johnson.

34.     The actions caused Mr. Johnson to experience symptoms of Post-Traumatic Stress Disorder, extreme anxiety and depression.

## COUNT ONE
### Hostile Work Environment in Violation of 42 U.S.C. § 1981

35.     Johnson re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 34 inclusive.

36.     The above-described illegal harassing and discriminatory conduct by the defendant was motivated by the plaintiff's race. Such conduct gives rise to liability under 42 U.S.C. § 1981 for the wrongful creation of a hostile work environment.

37.     The above-described harassing conduct was not welcomed by plaintiff and was so severe and pervasive as to create a work environment that was hostile and abusive.

38.     As a direct and proximate result of defendant's wilful and wrongful discriminatory acts, plaintiff has lost wages and fringe benefits and has suffered mental and emotional distress.

## COUNT TWO
### Hostile Work Environment in Violation of Title VII of the Civil Rights Act

39.     Johnson re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 38 inclusive.

40.     During the course of plaintiff's employment, the defendant discriminated against him on the basis of race with respect to the terms, conditions and privileges of his employment, including creating a hostile work environment caused by the illegal conduct of his supervisors and colleagues and otherwise subjecting him to racial harassment. Its actions therefore constitute unfair discriminatory practices in violation of Title VII of the Civil Rights Act, 42 U.S.C. §

2000e-2(a).

## COUNT THREE
### Race Discrimination in Violation of Title VII of the Civil Rights Act

41.     Johnson re-alleges and incorporates by reference each and every allegation

contained in  paragraphs 1 through 41 inclusive.

42.     During the course of plaintiff's employment, the defendant discriminated against

him on the basis of race with respect to the terms, conditions and privileges of his employment,

including creating a hostile work environment caused by the illegal conduct of his supervisors

and colleagues and otherwise subjecting him to racial harassment. Its actions therefore constitute

unfair discriminatory practices in violation of Title VII of the Civil Rights Act, 42 U.S.C. §

2000e-2(a).

## REQUEST FOR RELIEF

Plaintiff respectfully requests judgment against Defendant as follows:

a.     As to Count One, all relief available under 42 U.S.C. § 1981, including but not

limited to present and future compensatory damages for mental and emotional distress, present

and future damages for lost wages, and attorney fees and costs.

b.     As to Counts Two and Three, all relief available under Title VII of the Civil

Rights Act, including lost wages and fringe benefits, compensatory damages for loss of dignity

and mental and emotional anguish, and attorney fees and costs.

c.     Enjoining the Defendant, its agents, employees, successors and assigns from

engaging in any employment practices against its employees because of their race.

d.     For punitive damages.

e.     Any such other and further relief as may be appropriate under the circumstances.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

DATED:          January 30, 2017.

*s/ C. Kiel Garella*

C. Kiel Garella  (NC SBN #42839)
GARELLA LAW, P.C.
409 East Blvd.
Charlotte, NC 28203
Phone: (980) 321-7933
Fax: (704) 990-6734
kiel@gljustice.com

*s/ Jeff R. Dingwall*

Jeff R. Dingwall (CA SBN #265432)
EIGHT & SAND
110 West C Street, Suite 1903
San Diego, California 92101
Phone: (619) 796-3464
Fax: (619) 717-8762
jeff@eightandsandlaw.com
(*admission pending*)

*Attorneys for the Plaintiff*